## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **VIRGINIA H. SIMON** | **CIVIL ACTION** |
| **VERSUS** | **NO: 08-0725-KDE-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF**<br>**SOCIAL SECURITY ADMINISTRATION** | |

### REPORT AND RECOMMENDATION

The plaintiff, Virginia H. Simon ("Simon"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423.

### PROCEDURAL HISTORY

On May 26, 2004, Simon submitted an application for disability insurance benefits. She stated that she became disabled on February 14, 2000. R. 338-40. She reported that epilepsy, migraine headaches, seizures and sleep disorders limited her ability to work. R. 341. On January 20, 2005, a disability examiner determined that Simon was not disabled. R. 315. On February 7, 2005, she requested a hearing before an Administrative Law Judge ("ALJ"). R. 313.

After a delay caused by Hurricane Katrina, an ALJ issued a fully favorable decision on June 29, 2006. R. 317-324. He determined that: (a) Simon was disabled from February 14, 2000 through the date of the decision; (b) the evidence supported such a decision; and (c) a hearing was not necessary. R. 320. He made the following findings of fact and conclusions of law:

1.      Simon met the insured status requirements of the Social Security Act through June 30, 2001.

2.      Simon had not engaged in substantial gainful activity at any time relevant to his decision.

3.      Simon had a history of lateral instability and peroneal tendinitis of the left ankle, status post arthroscopy, debridement, and reconstruction of the left ankle on June 14, 2000; a seizure disorder; chronic migraine headaches; ischemic colitis; and urinary incontinence.  These were severe impairments.

4.      The severity of Simon's seizure disorder met the criteria of Listing 11.03 of the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4 (20 CFR 404.1520(d)).

5.      Simon had been under a disability as defined in the Social Security Act from February 14, 2000, through the date of the decision.

R. 320-24.

On August 24, 2006, the Appeals Council reported that the ALJ's decision and it would remand the case.  R. 326-30.  It reported that: (1) Simon did not meet insured status requirements as of the alleged onset date; (2) she was potentially entitled to Medicare benefits; and (3) the ALJ's conclusion that she was disabled since February 14, 2000 was not supported by substantial evidence or adequate rationale.  R. 327-28.  On October 19, 2006, the Appeals Council issued a notice of order of remand.  R. 333A-35.  It required that the ALJ offer Simon a hearing.  R. 334.  On February 15, 2007, there was a hearing before the ALJ.  R. 498-533.  On March 21, 2007, the ALJ issued an unfavorable decision.  R. 9-20.  On May 17, 2007, Simon requested review of this decision.  R. 8 and 488-496.  On December 26, 2007, the Appeals Council denied her request for review.  R. 4-6.

On January 24, 2008, Simon filed a complaint in federal court.  Rec. doc. 1.  The Commissioner filed an answer on April 29, 2008.  Rec. doc. 4.  The parties filed cross-motions for summary judgment.  Rec. doc. 6 and 7.

Simon has been represented by counsel throughout these proceedings.

## STATEMENT OF ISSUES ON APPEAL

Issue no. 1. Whether the ALJ was required to consult a medical expert regarding whether Simon's impairments met or equaled a listing prior to her date last insured, June 30, 2001?

Issue no. 2. Whether the ALJ erred in evaluating Simon's credibility?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. Simon last met the insured status requirements of the Social Security Act on June 30, 2001.

2. Simon did not engage in substantial gainful activity during the period from her alleged onset date of February 4, 2000 through June 30, 2001 (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3. Through June 30, 2001, Simon had the following severe impairments: left ankle arthoscopic surgery, seizures, and headaches (20 CFR 404.1520(c)).

4. Through June 30, 2001, Simon did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Simon had the residual functional capacity to perform the exertional demands of sedentary work, or work which was generally performed while sitting and did not require lifting in excess of ten pounds.

6. Through June 30, 2001, Simon was unable to perform her past relevant work (20 CFR 404.1565).

7. Simon was 47 years old on the date last insured, and was 53 years old at the time of the decision which is defined as an individual closely approaching advanced age (20 CFR 404.1563).

8. Simon had at least a high school education and was able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills was not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

3

10. Through June 30, 2001, considering Simon's age, education, work experiences, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Simon could have performed (20 CFR 404.1560(c) and 404.1566).

11. Simon was not under a disability as defined in the Social Security Act, at any time through February 4, 2000, the alleged onset date, through June 30, 2001, the date last insured (20 CFR 404.1520(g)).

R. 15-19

## ANALYSIS

a.  **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and

whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864

F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by

substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show

that she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide

procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599

& appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process

for determining whether an impairment prevents a person from engaging in any substantial gainful

activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d

232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Id.

b.   **Testimony at the hearing.**

Simon's attorney emphasized that: (1) this was a Medicare only claim; and (2) the issue was whether she was disabled prior to June 30, 2001.  R. 501.

In the fifteen years prior to the hearing, Simon worked as a secretary and embalmer.  She held the following positions in schools: teaching assistant; school monitor; substitute teacher; and cafeteria worker.  R. 504-05.  During this period the most she ever made in a year was $5,000.  R. 505.  Her last employment with the school board was in 2000.  R. 505.  She stopped working because she injured her ankle on February 14, 2000 and surgery was required.  R. 506.  The school board did not want her to return to work because of her seizures.  R. 506.  It did not want her around

6

children.  R. 517.

When the seizures occurred, she got headaches and went to bed.  R. 505.  She had experienced small seizures since the second grade.  R. 505.  In 2000, she had grand mal seizures where she blacked out, shook all over, bit her tongue, ate her mouth, lost control of her bladder, and vomited.  R. 506 and 508.  She was not conscious when she had such a seizure.  R. 507  It could take hours before she woke up from a grand mal seizure.  When she awoke, she had a terrible headache and was sick to her stomach.  R. 507-08.  She required an injection of Demerol with Phenergan to rid herself of the headaches.  R. 508.  In 2000, she also had petite mal seizures.  R. 506.  With the onset of these seizures she experienced a smell while she was talking or looking at someone.  R. 509.  These small seizures lasted from a few seconds to a few minutes.  R. 509.  She experienced them every day.  R. 510.  After the small seizures, she was tired.  R. 518.  Her ability to concentrate was affected by the seizures but only for a little while.  R. 519.  As a result of the seizures, she had trouble with her memory.  R. 519.

She had experienced tremors all of her life.  R. 510.  She had staring spells and experienced shaking throughout her body.  R. 510.  It became necessary for people to hold her so she did not fall down.  R. 510.  The tremors prevented her from writing.  R. 521.

In 2000 and 2001, Dr. Fleming treated her for seizures.  R. 511.  Dr. Fleming referred to partial seizures, which she described as the petite mal or small seizures.  R. 511.  His treatment did not control the seizures.  R. 511.  She left Dr. Fleming's care because he only saw her for a few minutes at time.  R. 14.  She did not believe he was treating her like a human being.  R. 15.  When she saw Dr. Cooke, she spent two to three hours in her office.  R. 512.  The visits included a physical examination.  Id.  Dr. Cooke changed the medications and ordered more tests.  R. 512-13.  Dr.

Cooke found that she was missing one blood vessel in her head and one in her chest.  R. 513.

In 2000, she had six to twelve migraine headaches a month.  R. 513-15.  The medication prescribed by Dr. Fleming did not help with the headaches.  R. 514.  When she had the headaches, she had to lie down all day.  R. 516.  In addition to the migraine headaches, she had regular headaches.  R. 516.

She lived with her husband who worked, but was not at home alone since her brother-in-law lived in the house.  R. 519.  She did not cook because she had started a fire previously.  R. 519-20.  Her husband took her out to eat.  R. 519.  She did not drive.  R. 520.  She could bathe herself.  R. 520.

The vocational expert reported that her past relevant work as a teaching assistant was considered skilled light work.  R. 523.  Based on the ALJ's hypothetical question, the expert said she would be able to perform unskilled sedentary work.  R. 524.  She would not be able to return to her past relevant work because of the limitations on her ability to stand and walk.  R. 524.  However, there were unskilled and sedentary jobs she could perform.  R. 524-25.

Simon's husband testified that they had been married thirty-three years.  R. 527.  Her condition had gotten worse.  Id.  She had seizures and tremors when she stopped working for the school board.  R. 429.  She had major seizures where her face collapsed, and she shook, twitched, foamed at the mouth, lost control of her bladder, gnawed at her tongue, and mumbled.  R. 529-30.  She experienced these seizures about five or six times a month.  R. 530.  They lasted about two to three minutes.  She became very weak and fell to the ground.  Id.  It took three to four minutes for her to return to normal.  Id.  She constantly experienced small seizures, where she smacked her mouth, mumbled and trembled.  R. 531.  They lasted sixty to ninety seconds.  Id.  She always

complained of headaches.  Id.  In 2000 and 2001, she had migraines.  Id.  He could tell from her appearance that she was having a migraine.  R. 532.  He brought her to the emergency room at East Jefferson for an injection to help with the pain.  Id.  She had about ten migraines a month.  Id.

c.   **Medical Evidence**.

### 1991-1999

On May 24, 1991, Simon's left foot was x-rayed.  The results were normal.  R. 463.

On November 11, 1991, Simon was seen by Dr. Hugh Fleming, a neurologist at the Browne-McHardy Clinic, on a referral for a neurological evaluation.  She began having seizures when she was sixteen.  The diagnosis was a history of mixed seizures which were intermittent over the last several years.  The examination did not reveal any deficits.  R. 478-79.  A 24-hour EEG was normal. R. 461-62.

On February 17, 1992, Simon returned to Dr. Fleming.  He reported that she was doing well on her medications with no abnormalities.  R. 477.  On May 29, 1992, Dr. Fleming reported increased auras and possible seizures which may be caused by stress and anxiety.  R. 476.  On November 20, 1992, she reported headaches but no seizures.  R. 476.

On March 10, 1993, Simon returned to Dr. Fleming.  She reported increasingly severe headaches which began after a hysterectomy in September 1991.  R. 475.  On June 25, 1993, she was seen by Dr. Green[2] on a consult from Dr. Fleming for migraine headaches.  R. 423.  On August 16, 1993, she returned to Dr. Fleming with reports of daily headaches.  She was described as clinically stable.  R. 422.  On September 23, October 18 and December 29, 1993, Simon was seen at the Browne-McHardy Clinic for changes in her medication.  R. 421-22.

---

[2] Dr. Green's full name and speciality do not appear in the records.  He was with the Browne-McHardy Clinic.

On February 7, 1994, Simon was seen by Dr. Fleming.  She was under extreme stress due to medical problems.  She had several auras but no definite seizures.  R. 475.  On March 29, 1994, she returned to Dr. Fleming.  She had pseudo seizures and was to return in a month.  R. 420.  On April 16, 1994, she was seen by Dr. Fleming.  He noted that Simon had headaches associated with stress in her family, she was not experiencing true seizures, the monitor was normal during the episodes, and the neurological exam was normal.  The diagnosis was stress and anxiety.  She was to return in three months.  R. 419.  On July 20, 1994, she reported extreme stress from marital problems.  R. 474.

On January 18, 1995, Simon was seen by Dr. Fleming.  She reported that in the preceding six months she had two or three minor seizures and one grand mal seizure.  He noted that she was very nervous and may have been having pseudo seizures.  R. 474.  A 24-hour EKG was normal.  R. 453-55.  On July 17, 1995, she reported no major seizures and only an occasional pseudo seizure since her last visit.  R. 473.

On September 4, 1996, Simon reported that she was under extreme stress with her husband and her marriage.  She had tension headaches, an occasional pseudo seizure, but no real seizures. R. 473.

On March 19, 1997, Simon was seen at the East Jefferson Hospital emergency room for a headache, nausea and vomiting.  The diagnosis was a migraine headache.  She was given an injection of Demerol and Phenergan.  R. 448.  On March 26, 1997, Dr. Fleming reported that she had a migraine headache with abnormal neurological sensations which were resolving.  She was under stress and tension which could be causing her headaches.  R. 472.  On November 25, 1997, she reported increasing daily headaches, but no seizures.  R. 471.

On January 5, 1998, Simon reported daily headaches which Dr. Fleming attributed to stress. R. 471.  On July 16, 1998, she reported that she had done well until she fell down as a result of low blood pressure and hit her head.  She had some headaches since the fall.  She did not have seizures. The neurological examination was normal.  R. 470.

On July 8, 1999, Simon was seen by Dr. Fleming.  He reported that she had an occasional headache every two to three months, but recent headaches were severe because they lasted two to three days.  The neurological examination was normal.  Her seizures were described as well controlled.  R. 470.  On October 29, 1999, she was seen by Dr. Green on a consult from Dr. Fleming. R. 416.  On November 3, 1999, there was lab work done at Dr. Fleming's request.  R. 417-18.

**2000**

On January 20, 2000, Simon was seen by Raoul Rodriguez, Jr. M.D., an orthopedist at Tulane University Hospital and Clinic, for complaints of problems with her left ankle.  He had not seen her since May 1999.  Surgery was recommended.  R. 31, 276 and 437.  Blood work was done on February 7, 2001.  R. 412, 424-25.

On February 11, 2000, Simon was seen at Tulane by Jack Geoula, M.D. for preoperative clearance for surgery on her ankle by Dr. Rodriguez.  She denied any history of diabetes, bleeding disorders or problems with anesthesia.  Her past history included epilepsy, migraine disorder and a recent fall on uneven payment at an ER entrance.  She denied any headaches, vomiting, weakness or numbness in her extremities, visual changes or speech difficulties.  The physical examination found that she was in no acute distress.  The neurological examination found her alert and oriented. The impression was left ankle pain, epilepsy and migraine disorder.  She was described as a low risk surgical candidate and was cleared for surgery.  R. 33, 278 and 435.  On February 14, 2000, Dr.

Rodriguez performed left ankle arthoscopic surgery and a lateral ligament reconstruction using a modified Brostrum type surgical approach.  R. 38-39, 283-84 and 433-34.

On April 6, 2000, Dr. Rodriguez described Simon as having a good result from the surgery. She was advised to exercise and engage in physical therapy.  R. 36, 281 and 432.  On April 25, 2000, she returned to Dr. Rodriguez.  She was on physical therapy.  R. 40, 285 and 431.  On May 18, 2000, Dr. Rodriguez reported that she was doing well from the surgery but she might be experiencing inflammatory arthritis. R. 37, 282 and 430.  On May 18, 2000, there were x-rays of her left ankle.  R. 35, 280 and 429.  On June 1, 2000, Dr. Rodriguez found definite swelling of the left ankle.  He recommended that she not return to work for a month.  He was hopeful that she would be able to return to work at that time.  R. 32, 277 and 428.  On June 29, 2000, Dr. Rodriguez reported that Simon was doing better.  R. 30, 275 and 427.  On August 24, 2000, Dr. Rodriguez reported that Simon was making good progress.  He was hopeful she would be recovered soon.  He did not have an estimate as to when she would be fully recovered.  R. 29, 274 and 426.

**2001**

On January 31, 2001, Simon was seen by Dr. Green for a six-month follow-up on a consult from Dr. Fleming.  A neurological examination was normal.  R. 411.  On February 6, 2001, lab work was done at Dr. Fleming's request.  R. 413-14.

On April 1, 2001, Simon was seen at the East Jefferson emergency department for complaints of ankle and finger pain after a fall.  She reported a history of seizures and ankle surgery. She reported that she needed to remain quite active in order to take care of her grandchildren.  The diagnosis was thigh contusion, sprained ankle and sprained finger.  R. 227-28 and 440-441.  She complained of a headache.  R. 442.  X-rays of her left fingers, thigh and left ankle were negative.

R. 230-32, 438 and 443-44.  There were no reports of seizures.  R. 445.

On August 7, 2001, there was a MRI of the brain at the request of Dr. Fleming.  It revealed cerebellar atrophic changes out of proportion to the degree of cerebral atrophy.  It was otherwise negative.  R. 52 and 221.

On December 20, 2001, there was a CT Scan and an x-ray of Simon's abdomen.  The tests were prompted by anorexia weight loss.  R. 47-49, 213-214 and 251-52.

### 2002

Because of the weight loss there was a chest x-ray on January 21, 2002 which was normal. R. 60, 217 and 255.

On June 6, 2002, Simon was seen at Ochsner Clinic Foundation with complaints of headaches which had lasted for two days.  R. 289.

On July 10, 2002, Simon was seen by Dr. Fleming.  It had been a year since her last visit. She reported no major seizures and an occasional partial seizure.  She had some stress and tension headaches because she was taking care of a 98-year old relative.  The findings on the neurological examination were normal.  Her medication was changed.  She was to follow up with Dr. Green and return to Dr. Fleming in a year.  R. 468.

On September 9, 2002, Simon was seen at Ochsner for a dry cough.  R. 291.  On October 21, 2002, Simon was seen by Dwight Green, M.D.[3] at Ochsner for a complaint of a rash on the back of her right leg.  Except for the rash, she reported that she was in stable health.  The physical exam noted that she was not in acute distress.  She was to return in two weeks if the lesions persisted.  R. 293.

---

[3]  Dr. Green at Ochsner appears to be a different from the Dr. Green, who saw Simon on consults from Dr. Fleming.  See R. 293 and 411 for a comparison of their signatures.

**2003**

Simon became dissatisfied with Dr. Fleming.  On May 27, 2003, she began seeing Patricia Cook, M.D., a specialist in neurological medicine and electrodiagnosis.  R. 93.  She reported a history of seizures, migraine headaches and difficulty sleeping.  She reported that when she was first diagnosed with seizures, Dilantin was prescribed, and in her 20s she was switched to Tegretol.  Dr. Cook found that Simon had focal seizures originating in the uncus and temporal lobe producing the olfactory and gustatory hallucinations prior to their spread into major motor seizures.  Dr. Cook recommended a trial of newer anti-seizure medications.  She reported that Simon suffered from chronic daily headaches because of overuse of medication.  R. 93-96.  An EEG was abnormal with evidence of a mild degree of general background slowing.  R. 90.  An MRI of the head performed on July 17, 2003 revealed cerebellar atrophy and questioned mesial temporal lobe sclerosis.  R. 86.

Simon returned to Dr. Cook on August 12, 2003 at which time the medication was adjusted.  Simon had experienced approximately seven seizures in June, six in July, and one in August.  All of these were partial seizures.  Simon was told to refrain from taking her medication for headaches on a daily basis.  Dr. Cook described Simon as a possible candidate for temporal lobe surgery to relieve the epilepsy.  R. 84-85.

On September 23, 2003, Simon was seen by Dr. Green at Ochsner for complaints of pain in her right ribs.  Although Dr. Green described it as a rib fracture, two x-rays were not able to find any evidence of a rib fracture.  R. 296-97 and 299-300.

On November 12, 2003, Simon was seen by Dr. Cook.  She reported that she was doing well.  She reported only partial seizures without any progression to loss of awareness.  Simon's mother-in-law was living with her.  R. 82-83.

14

**2004**

On March 9, 2004, Simon reported to Dr. Cook that she was doing well, but she had a momentary aura about ten to twelve times a month. They were sporadic. They did not awaken her from sleep and she had no convulsions. Simon related them to stress caused by her paranoid-schizophrenic brother-in-law and her mother-in-law, an Alzheimer's patient, who were living with her. Dr. Cook observed tremors in her fingers and trace unsteadiness in her walking. R. 80-81. On July 21, 2004, Simon reported to Dr. Cook that she only experienced aura seizures which were decreasing. She reported tremors that lasted about five minutes. She reported migraine headaches but no nausea or vomiting. R. 78-79. On November 24, 2004, she reported that all of her seizures were small without any loss of consciousness. They occurred ten to twelve times per month. She reported that she had more control over her seizures than ever before. R. 76-77. On November 30, 2004, Simon was seen by Dr. Marcus Black[4] for mild neutropenia. Lab work demonstrated that her white cells fell within the normal range. R. 304-05.

**2005**

On February 11, 2005, Simon was seen by Dr. Green with a complaint of a severe headache and nausea. She was given Demerol with Phenergan. R. 298. On March 29, 2005, she was seen by Dr. Cook. She reported seizures without convulsions and migraine headaches. R. 74-75.

---

[4] Dr. Black's speciality was not identified.

**2006**

On January 24, 2006, she was seen by Dr. Michael Happel, a neurologist.  She reported two to four seizures per day which was a dramatic increase from 2005.  She reported headaches and increased nervousness after Hurricane Katrina.  Dr. Happel recommended changes in her medication to obtain better control over her seizures.  R. 259-60.  On March 15, 2006, she reported seizures, headaches and nervousness.  Changes were made in her medication.  R. 261-62.

e.      **Plaintiff's Appeal.**

Issue no.1.      Whether the ALJ was required to consult a medical expert regarding whether Simon's impairments met or equaled a listing prior to her date last insured, June 30, 2001?

Simon contends that the ALJ was required to obtain an updated medical opinion from a medical expert because more than 100 pages of new evidence were submitted at the hearing level which may have changed the findings of the medical consultant for the state agency.  She requests that her own testimony be used to establish the onset date of her epilepsy rather than the medical evidence generated as of June 30, 2001.  The Commissioner responds that: (1) pursuant to Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, the ALJ properly considered the report of the state medical consultant; and (2) the new evidence is not relevant as it covers the period before or after the period (February 4, 2000 - June 30, 2001) within which Simon must establish disability; and (3) it is within the province of the ALJ to determine whether additional medical evidence may have changed the consultant's findings.

The medical consultant for the state agency completed her report on January 18, 2005.  R. 480-87.  The most recent medical information considered by the consultant was a July 28, 2004 letter from Dr. Cook to Dr. Green.  R. 487.  The limitations established by the consultant permitted

Simon to perform sedentary work.  R. 481-84.  The ALJ's decision reveals that he considered the opinion evidence in accord with SSR 96-6p.  R. 16.  He determined that the majority of the medical evidence was irrelevant and Simon's medical condition did not support a disabling level of impairment during the period of February 2000 and June 30, 2001.  R. 17-18.  There is substantial evidence to support the ALJ's findings.

The period within which Simon was required to establish disability began on February 4, 2000.  Simon saw Dr. Fleming on July 8, 1999.  It was noted that her recent headaches were more severe and lasted two to three days.  Her seizures, however, were well controlled.  A neurological examination was normal.  R. 470.  She was seen by Dr. Green for headaches on October 29, 1999.  R. 416.  Some lab work was done for Dr. Fleming on November 3, 1999.  R. 417-18.  There is no record of any treatment for her seizures or headaches in 2000.

In 2000, Simon had ankle surgery.  There was a pre-operative physical on February 11, 2000.  She denied any headaches or vomiting.  She was not in acute distress.  The neurological examination found her alert and oriented.  R. 33.  She was seen by her surgeon regularly in April, May and June of 2000.  Although the focus of his attention was her recovery from the ankle surgery, there were no reports of debilitating migraine headaches or seizures.  The surgeon thought she would be able to return to work by July 1, 2000.  R. 32.

On January 31, 2001, a neurological examination by Dr. Green on a six-month follow-up visit was normal.  R. 411.  On April 1, 2001, Simon went to the emergency room with complaints of ankle and finger pain after a fall.  She reported that she needed to remain quite active in order to take care of her grandchildren.  She complained of a headache, but she did not report seizures.  R. 440-42.  There is substantial evidence to support the finding that Simon's medical condition was not

17

disabling during the period between February 2000 and June 30, 2001.  R. 17-18.

Dr. Fleming's note of July 10, 2002 reflects that Simon did not report any major seizures in the preceding year and only an occasional partial seizure.  She was experiencing stress and tension headaches but she was taking care of her 98-year-old relative.  A neurological examination was normal.  She was to return to Drs. Fleming and Green in a year.  Simon did not begin seeing Dr. Cook until May 27, 2003, nearly two years after the deadline for establishing disability, at which time Simon reported seizures at a much greater frequency.  She reported twelve seizures in June and July 2003.  Her medication was changed.  R. 84-85.  By November 24, 2004, Simon reported that she had more control over seizures than ever before.  R. 76-77.  In 2006, she reported that the frequency of her seizures had increased dramatically from 2005.  R. 259-60.

The medical evidence after June 30, 2001 does not demonstrate or suggest that there was any error or failure to record what Simon told her doctors from February 4, 2000 through June 30, 2001 regarding her seizures, headaches and other symptoms.  There is substantial evidence to support the ALJ's finding that the pre-February 4, 2000 evidence and the post June 30, 2001 evidence are not relevant.  The ALJ was not required to obtain an updated medical opinion from a medical expert because the additional medical evidence was not relevant and it would not have changed the findings of the medical consultant for the state agency.

<u>Issue no. 2.</u>     Whether the ALJ erred in evaluating Simon's credibility?

Simon challenges the ALJ's finding on credibility.  She urges that the ALJ ignored her testimony concerning her lack of confidence in Dr. Fleming, as well as ignored Dr. Cook's objective findings and the letters from her family and friends.  She contends that the ALJ did not comply with SSR 96-7p, 1996 WL 374186, regarding assessment of the credibility of an individual's statements.

The Commissioner responds that the ALJ properly considered and discounted Simon's subjective complaints.

In determining Simon's residual functional capacity, the ALJ considered the symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence.  Because he determined that Simon's symptoms could suggest a greater level of severity of impairment than could be shown by the medical evidence alone, he turned to 20 C.F.R. 404.1529(c) for the kinds of evidence he was required to consider to assess Simon's credibility.  R. 16.  He described Simon's testimony concerning her seizures and headaches in 2000 and 2001, and found that her statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.  R. 17.

The resolution of conflicts between subjective complaints and objective evidence should depend upon the ALJ's evaluation of the credibility of the claimant's complaints of pain.  Hollis v. Bowen, 837 F.2d 1378, 1385 (5th Cir. 1988).  Judgment as to the credibility of plaintiff's testimony is the providence of the ALJ.  Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991).  Pursuant to SSR 96-7p, "[o]ne strong indication of an individual's statements is their consistency, both internally and with other information in the case record."  1996 WL 374186 *5.

At the hearing on February 15, 2007, Simon was asked to describe the seizures and headaches she experienced in 2000.  She responded that she had grand mal seizures where she blacked out, shook all over, bit her tongue, ate her mouth, lost control of her bladder, and vomited.  R. 506 and 508.  She reported that: (a) she was not conscious when she had such a seizure; (b) it could take hours before she woke up; (c) after the seizure she had a terrible headache and was sick to her stomach; and (d) she required an injection of Demerol with Phenergan to rid herself of the

headaches.  R. 507-08.  She also reported having petite mal seizures in 2000.  R. 506.

This testimony is not consistent with what she reported to her physicians in 2000.  There are no reports to Dr. Rodriguez, the surgeon for her ankle, of any seizures.  When she was examined in preparation for the surgery, she reported to Dr. Geoula that she did not have any headaches or vomiting. The neurological examination in preparation for the surgery was normal.  She was described as a low risk candidate and was cleared for surgery.  Dr. Rodriguez saw Simon regularly from January through June 2000, but his notes do not reflect any of the symptoms described by Simon at the hearing. R. 29-39.  There are no reports of injections of Demerol with Phenergan from February 4, 2000 through June 30, 2001.  There are no reports of seizures as she described at the hearing.  On April 1, 2001, she went to the emergency room after a fall.  Although she reported headaches, she did not report any seizures.  She also reported that she was quite active taking care of her grandchildren.  R. 227-28.

Based upon the conflicts between Simon's testimony at the hearing and the information she provided her physicians in 2000 and 2001, there is substantial evidence to support the ALJ's finding that her testimony regarding her symptoms was not entirely credible.  This conclusion also demonstrates why the ALJ did not err in refusing to use Simon's testimony to establish the onset date of her epilepsy rather than the medical evidence generated as of June 30, 2001.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Commissioner's cross-motion for summary judgment (Rec. doc. 7) be granted and Simon's motion for summary judgment (Rec. doc. 6) be denied and her complaint be dismissed with prejudice.

**<u>OBJECTIONS</u>**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 23rd day of December, 2008.

**SALLY SHUSHAN**
**United States Magistrate Judge**